Slip Op. 13-108

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DOWNHOLE PIPE & EQUIPMENT, LP,** | |
| Plaintiff, | |
| v. | |
| **UNITED STATES and UNITED STATES INTERNATIONAL TRADE COMMISSION,** | **Before: Timothy C. Stanceu, Judge** |
| Defendants, | **Court No. 11-00080** |
| and | <u>**PUBLIC VERSION**</u> |
| **VAM DRILLING USA, TEXAS STEEL CONVERSIONS, INC., ROTARY DRILLING TOOLS, TMK IPSCO, and UNITED STATES STEEL CORPORATION,** | |
| Defendant-intervenors. | |

## <u>OPINION AND ORDER</u>

[Remanding a final affirmative determination by the U.S. International Trade Commission, made in an antidumping and countervailing duty proceeding, that a domestic industry is threatened with material injury by reason of imports of steel drill pipe and steel drill collars from China]

Date: August 19, 2013

*Mark B. Lehnardt*, Lehnardt & Lehnardt LLC, of Liberty, MO and *Irene H. Chen*, Chen Law Group LLC, of Rockville, MD, for plaintiff.

*David A.J. Goldfine*, Attorney-Advisor, U.S. International Trade Commission, of Washington, DC, for defendant.  With him on the brief were *James M. Lyons*, General Counsel and *Neal J. Reynolds*, Assistant General Counsel for Litigation.

*Roger B. Schagrin* and *John W. Bohn*, Schagrin Associates, of Washington, DC, for defendant-intervenors VAM Drilling USA, Texas Steel Conversions, Inc., Rotary Drilling Tools, and TMK IPSCO.

*Stephen P. Vaughn*, *Robert E. Lighthizer*, *James C. Hecht*, and *Stephen J. Narkin*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Stanceu, Judge: Plaintiff Downhole Pipe & Equipment, LP ("Downhole Pipe") contests a final determination of the U.S. International Trade Commission ("ITC" or the "Commission") that a domestic industry is threatened with material injury by dumped and subsidized imports of steel drill pipe and steel drill collars ("subject merchandise") from the People's Republic of China ("China" or the "PRC").  Compl. ¶ 26 (Apr. 29, 2011), ECF No. 8; *see Drill Pipe and Drill Collars From China*, 76 Fed. Reg. 11,812 (Mar. 3, 2011) ("*Final Injury Determination*"), *Drill Pipe and Drill Collars from China*, Inv. Nos. 701-TA-474 and 731-TA-1176 (Final), USITC Pub. 4213 (Feb. 2011) ("*ITC Report*").[1]  Downhole Pipe, an importer of the merchandise subject to the antidumping and countervailing duty investigations and a respondent before the Commission, claims that aspects of the affirmative final threat determination were unsupported by substantial evidence and otherwise not in accordance with law.  Compl. ¶¶ 5-26.

Before the court is Downhole Pipe's motion under USCIT Rule 56.2 for judgment on the agency record.  Pl.'s R. 56.2 Mot. for J. on the Agency R. (Oct. 19, 2011), ECF No. 28 ("Pl.'s Mot.").  Defendant-intervenors VAM Drilling USA, Texas Steel Conversions, Inc., Rotary Drilling Tools, and TMK IPSCO, all petitioners before the ITC, support the ITC's affirmative threat determination, as does defendant-intervenor United States Steel Corporation ("U.S. Steel").  The defendant-intervenors argue that the ITC conducted a proper analysis and that the threat determination is supported by substantial evidence and in accordance with law.  The court concludes that certain findings and conclusions within the ITC's determination are not supported

---

[1] Confidential documents within the administrative record are identified by the abbreviation "CR" and public documents are referred by the abbreviation "PR."  Confidential information has been redacted from certain footnotes in this public Opinion and Order as identified by blank spaces within brackets.

by substantial evidence.  The court remands the affirmative threat determination to the

Commission for reconsideration.

## I. BACKGROUND

The ITC initiated its injury and threat investigation on January 6, 2010 in response to

petitions concurrently filed on December 31, 2009 with the Commission and the International

Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department").  *Drill*

*Pipe from China*, 75 Fed. Reg. 877, 878 (Jan. 6, 2010).  On March 8, 2010, the ITC published

the preliminary results of its investigation, determining that "there is a reasonable indication that

an industry in the United States is threatened with material injury by reason of imports from

China of drill pipe and drill collars."  *Drill Pipe & Drill Collars from China*, 75 Fed.

Reg. 10,501 (Mar. 8, 2010); *see also Drill Pipe and Drill Collars from China*, Inv.

Nos. 701-TA-474 and 731-TA-1176 (Prelim.), USITC Pub. No. 4127, PR 253, (Mar. 2010), at 3.

On January 11, 2011, Commerce determined that subject merchandise was being sold at

less than fair value.  *Drill Pipe From the People's Republic of China: Final Determination of*

*Sales at Less Than Fair Value & Critical Circumstances*, 76 Fed. Reg. 1,966 (Jan. 11, 2011).

Concurrently, Commerce determined that the Chinese industry was being provided with

countervailable subsidies.  *Drill Pipe from the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*,

76 Fed. Reg. 1,971 (Jan. 11, 2011).

Commerce published antidumping and countervailing duty orders on March 3, 2011, the

same day the ITC published its final affirmative threat determination, which it based on a period

of investigation ("POI") beginning in January 2007 and ending in June 2010.  *Drill Pipe From*

*the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 11,757 (Mar. 3, 2011);

*Drill Pipe From the People's Republic of China: Countervailing Duty Order*, 76 Fed.

Reg. 11,758 (Mar. 3, 2011); *Final Injury Determination*, 76 Fed. Reg. at 11,812.  The

Commission reached its affirmative threat determination on the votes of three of the six

Commissioners (Vice Chairman Williamson and Commissioners Lane and Pinkert) and noted

the dissenting votes of Chairman Okun and Commissioners Pearson and Aranoff.  *See Final*

*Injury Determination*, 76 Fed. Reg. at 11,813.

Downhole Pipe initiated this action by filing a summons on April 1, 2011 and a

complaint on April 29, 2011.  Summons, ECF No. 1; Compl.  On October 18, 2011, plaintiff

moved for judgment on the agency record pursuant to USCIT Rule 56.2.  Pl.'s Mot.; Pl.'s R. 56

Mem. of Law in Supp. of Mot. for J. on the Agency R. (Oct. 19, 2011), ECF No. 28-1 ("Pl.'s

Mem.").  Defendant and defendant-intervenors responded to this motion on January 25, 2012.

Mem. of Def. U.S. Int'l Trade Comm'n in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF

No. 38 ("Def.'s Resp."); Mem. of Def.-Intervenors VAM Drilling USA; Texas Steel

Conversions, Inc.; Rotary Drilling Tools; and TMK IPSCO in Opp'n to Mot. for J. on the

Agency R. by Pl. Downhole Pipe & Equipment L.P., ECF No. 39; Mem. in Opp'n to Pl.'s Mot.

for J. on the Agency R. Filed by Def.-Int. U.S. Steel Corp., ECF No. 40 ("U.S. Steel Resp.").  On

February 29, 2012, plaintiff filed its reply.  Pl.'s Reply Br. to Def. and Def.-Intervenors' Resps.

to Pl.'s R. 56.2 Mot. for J. on the Agency R., ECF No. 57.  The court held oral argument on

July 26, 2012.  ECF No. 75.

## II. DISCUSSION

The court exercises jurisdiction over this action under section 201 of the Customs Courts

Act of 1980, 28 U.S.C. § 1581(c) (2006), which grants jurisdiction of civil actions brought under

section 516A of the Tariff Act of 1930 (the "Act"), 19 U.S.C. § 1516a(a)(2)(B)(i) (2006).[2]

Where, as here, an action is brought under 19 U.S.C. § 1516a(a)(2) seeking review of a final

determination of the ITC reached under 19 U.S.C. § 1673d, "[t]he court shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The ITC's

determinations must take "into account the entire record, including whatever fairly detracts from

the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.

Cir. 1984) (footnote omitted).  The Commission must explain the standards applied and the

analysis leading up to the conclusion, thereby demonstrating a rational connection between the

evidence on the record and the conclusions drawn. *Matsushita Elec. Indus. Co., Ltd. v. United

States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

The imported merchandise subject to the antidumping and countervailing duty

investigations consists of steel drill pipe and steel drill collars and includes these products in

unfinished form, including "green tubes," which are drill pipes and drill collars not yet forged

and assembled. *ITC Report: Comm'n Views* 5-7.  Drill pipes and drill collars are used

on onshore and offshore drilling rigs, chiefly in the drilling of oil and gas wells. *Id*. at 5.  Drill

pipes serve as rotational components in an assembly of other components (the "drill stem") that

includes drill collars. *Id*. at 5-6 (footnote omitted).  Drill pipes are lengths of seamless hollow

tube, generally 30-31 feet long, with threaded connecting pieces ("tool joints") welded to each

end that are designed to be leak-proof to contain the drilling fluids. *Id.* at 6 (footnote omitted).

Drill collars are heavy, thicker-walled components of the drill stem that provide stiffness to the

drill stem and add weight to the drill bit. *Id.* at 7 (footnote omitted).  Drill pipe ordinarily is

---

[2] Unless otherwise indicated, further citations to the Tariff Act of 1930 are to the relevant
portions of Title 19 of the U.S. Code, 2006 edition.

designed to meet standards adopted by the American Petroleum Institute ("API"); "premium"

drill pipe is specially designed for harsh drilling conditions that require properties surpassing the

API standards.  *Id.* at 7 (footnote omitted).

Plaintiff raises two claims in this litigation, which the court addresses below.  Downhole

Pipe claims, first, that the Commission's determination of the domestic like product is

impermissible, arguing that the ITC should have considered unfinished drill pipe to be a separate

like product.  Pl.'s Mem. 40.  Second, challenging numerous of the Commission's factual

findings and conclusions, Downhole Pipe claims that the Commission erred in determining that

the drill pipe and collar industry is threatened with material injury by reason of imports of

subject merchandise.  *Id*. at 11-39.

### A.  Plaintiff Is Not Entitled to Relief on its Claim Contesting the ITC's Like Product Determination

For the purpose of determining whether one or more domestic industries are injured or

threatened with injury from subject imports, section 771(4)(A) of the Act requires the

Commission to identify as a domestic industry "the producers as a whole of a domestic like

product, or those producers whose collective output of a domestic like product constitutes a

major proportion of the total domestic production of a product."  19 U.S.C. § 1677(4)(A).  In the

investigation giving rise to this litigation, the ITC concluded that steel drill pipes and steel drill

collars, whether finished or unfinished, comprise a single domestic like product.  *ITC Report:*

*Comm'n Views* 7-17.  In so concluding, the ITC rejected arguments that it should find a separate

like product consisting of unfinished drill pipe and drill collars, *id.* at 7-12, or a separate like

product consisting of "premium" drill pipe, *id.* at 12-14.

In its Rule 56.2 motion, plaintiff asserts a claim that the Commission's domestic like

product finding is unsupported by substantial evidence.  Pl.'s Mem. 40; *see* Compl. ¶ 6.

Plaintiff's Rule 56.2 brief offers only one ground for this claim: "To the extent that the Plaintiff's appeal of Commerce's scope determinations is successful, Downhole Pipe reserves the right to raise the like-product arguments raised in its prehearing brief, and incorporated by reference herein."  Pl.'s Mem. 40 (citing *Pre-Hearing Br. of Downhole Pipe & Equipment, L.P. and Command Energy Services, Ltd.* (Dec. 15, 2010), PR 154 at 40-44 ("*Resps.' Pre-Hearing Br.*")). Plaintiff's prehearing brief before the ITC informed the Commission that scope inquiries were pending before Commerce on the question of whether green tube for drill pipe falls within the scope of the antidumping duty order on certain oil country tubular goods from China; products falling within the scope of another antidumping duty or countervailing duty order are expressly excluded from the scope of the investigations as defined by Commerce.  *See Resps.' Pre-Hearing Br.* 40-41.  In that brief, Downhole Pipe argued that information on the record of the investigation at issue in this case demonstrates that green tubes should be a separate domestic like product.  *Id.* at 42-44.

The Views of the Commission state that "[a]lthough Respondents argued in their prehearing brief that the Commission should find green tubes to be a separate domestic like product, *Respondents assert unequivocally in their posthearing brief that 'the Commission should find one domestic like product consisting of a continuum of drill pipe and drill collar products.'*"  *ITC Report: Comm'n Views* 8 (citing *Resps.' Prehearing Brief* at 43; *Post-Hearing Br. of Downhole Pipe & Equipment, L.P. and Command Energy Services, Ltd.* (Jan. 12, 2011), PR 192, at 3 (*Resps.' Post-hearing Br.*")) (emphasis added).  The two respondents in the proceedings before the ITC, Downhole Pipe and another importer, Command Energy Services, Ltd. ("Command"), filed joint prehearing and posthearing briefs.  *Id.* at 3.  The joint posthearing brief to which the Commission referred expresses the position that the Commission should find a single like product, and the record does not contain information contradicting the Commission's

statement that Downhole Pipe changed its position before the ITC, thereby abandoning its

previous position advocating a separate domestic like product consisting of green tubes.  Nor

does plaintiff, in its Rule 56.2 motion, direct the court's attention to any such information.  The

court finds from the record evidence that during the investigation plaintiff abandoned its

previous position advocating a separate like product and adopted a position in favor of a single

like product.

The court, in its discretion, declines relief on plaintiff's claim contesting the

Commission's domestic like product determination.  Plaintiff is advocating before the court a

position exactly contrary to the position it took in the posthearing brief before the ITC that it

filed jointly with Command.  The court, therefore, declines to consider the claim on the merits on

the ground of judicial estoppel.  *See Trustees in Bankr. of N. Am. Rubber Thread Co. v. United

States*, 593 F.3d 1346, 1353-54 (Fed. Cir. 2010).  Moreover, because plaintiff did not maintain in

the posthearing brief the position it took in its prehearing brief, the ITC did not have occasion to

rule on the specific like product issue plaintiff attempts to raise before the court.  It is also

appropriate, therefore, to deny relief on plaintiff's like product claim for the failure to exhaust

administrative remedies.  *See* 28 U.S.C. § 2637(d) (providing that this Court shall, where

appropriate, require the exhaustion of administrative remedies).

B.  The Affirmative Threat Determination Must Be Remanded to the Commission

Plaintiff directs the remainder of its Rule 56.2 motion to contesting the ITC's

determination that the single domestic industry, although not experiencing present injury, is

threatened with material injury by reason of imports of the subject merchandise.  In its motion,

plaintiff challenges various of the Commission's underlying findings as unsupported by

substantial record evidence.  Pl.'s Mem. 11-39.  Specifically, plaintiff challenges the ITC's

findings as to likely volume effects of the subject imports, the findings as to the likely price

effects of the subject imports, and the finding of a likely adverse impact by those imports on the

domestic industry.  *Id.*

Sections 705(b)(1) and 735(b)(1) of the Act require the ITC to determine whether a

domestic industry or industries are materially injured, or threatened with material injury, "by

reason of imports, or sales (or the likelihood of sales)" of the merchandise for which Commerce

has made an affirmative determination of subsidy or sales at less than fair value.  19 U.S.C.

§§ 1671d(b)(1), 1673d(b)(1).  Section 771(7)(A) of the Act defines material injury as "harm

which is not inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).

In determining whether an industry is threatened with material injury, the ITC is required

"to consider, among other relevant economic factors," eight specific factors.  19 U.S.C.

§ 1677(7)(F)(i).  Particularly relevant to this case is the third specific threat factor: "a significant

rate of increase of the volume or market penetration of imports of the subject merchandise

indicating the likelihood of substantially increased imports."  *Id.* § 1677(7)(F)(i)(III).  The statute

also contains a ninth, nonspecific threat factor: "any other demonstrable adverse trends that

indicate the probability that there is likely to be material injury by reason of imports (or sale for

importation) of the subject merchandise (whether or not it is actually being imported at the

time)."  *Id.* § 1677(7)(F)(i)(IX).[3]

---

[3] The other economic factors prescribed by the statute for the threat determination are as
follows: the nature of the countervailable subsidy, 19 U.S.C. § 1677(7)(F)(i)(I); "any existing
unused production capacity or imminent, substantial increase in production capacity in the
exporting country indicating the likelihood of substantially increased imports of the subject
merchandise into the United States, taking into account the availability of other export markets to
absorb any additional exports," *id.* § 1677(7)(F)(i)(II); "whether imports of the subject
merchandise are entering at prices that are likely to have a significant depressing or suppressing
effect on domestic prices, and are likely to increase demand for further imports," *id.*
§ 1677(7)(F)(i)(IV); "inventories of the subject merchandise," *id.* § 1677(7)(F)(i)(V); "the
potential for product-shifting if production facilities in the foreign country, which can be used to
produce the subject merchandise, are currently being used to produce other products," *id.*

(continued . . .)

The Commission is to consider the nine statutory threat factors "as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this subtitle." *Id.* § 1677(7)(F)(ii).  "The presence or absence of any one factor which the Commission is required to consider . . . shall not necessarily give decisive guidance with respect to the determination," which must "be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent" and not "on the basis of mere conjecture or supposition." *Id*.  The legislative history clarifies that the ITC's threat determination "require[s] a careful assessment of identifiable current trends and competitive conditions in the marketplace . . . [and] a thorough, practical, and realistic evaluation of how it operates, the role of imports in the market, the rate of increase in unfairly traded imports, and their probable future impact on the industry."  H.R. Conf. Rep. No. 1156, 98th Cong., 2d Sess. 174-75 (1984), U.S. Code Cong. & Admin. News 1984, pp. 4910, 5291, 5292.

As to present injury, the Commission reached a negative determination despite concluding that over the POI "the domestic industry suffered significant declines in a number of basic indicators, including production, shipments, sales, and employment" and that "the industry's operating profits were solid in 2007 and 2008, dropped sharply in 2009 (as adjusted) to an overall loss, then improved in first-half 2010 to a level below the levels of 2007 and 2008." *ITC Report: Comm'n Views* 38-39 (footnote omitted).  The ITC found, however, that "[s]ubject imports played a role in these declines but we cannot find their role to be significant given the

---

( . . . continued)

§ 1677(7)(F)(i)(VI); the likelihood of product shifting involving raw and processed agricultural products (not relevant to this case), *id*. § 1677(7)(F)(i)(VII); and "the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product," *id*. § 1677(7)(F)(i)(VIII).

substantial market turmoil that occurred in 2009 and first-half 2010." *Id.* at 39. By "market

turmoil," the Commission referred to severe declines in oil and gas prices, which reached low

levels in 2009, and to a resulting sharp decline in drilling activity that began in October 2008 and

continued until May 2009 before returning close to 2007 levels by 2010. *Id.* at 24 (footnotes

omitted).

> 1. Two Erroneous Findings of Fact, and Two Erroneous Conclusions from those Findings,
> Require the Court to Remand the Affirmative Threat Determination

In determining the domestic drill pipe and collar industry to be threatened with material

injury, the Commission reached conclusions on the future volume of imports of subject imports,

the future price effects of those imports, and the impact of those future imports on the domestic

industry. As to volume, the Commission concluded "that subject imports will increase

significantly in absolute terms and relative to domestic consumption and production in the

imminent future . . . ." *ITC Report: Comm'n Views* 32. On price effects, the ITC found that

"subject imports are likely to enter at prices that will have significant price-depressing and/or

price-suppressing effects." *Id.* at 34. On impact of the subject imports, the Commission stated

that "[g]iven that the industry is already in a weakened state, we conclude that, unless

antidumping duty and countervailing duty orders are issued, significant volumes of dumped and

subsidized imports will gain additional U.S. market share in the imminent future and material

injury by reason of subject imports will occur." *Id.* at 37.

The Commission summarized four findings of fact to support its conclusion that subject

imports would increase significantly in volume: (1) "subject imports held a substantial share of

the U.S. market throughout the period examined, a share that grew in first-half 2010;"

(2) "importers of subject merchandise have now become suppliers to even the largest U.S.

purchasers and thus have demonstrated access to the full range of the API-grade drill pipe and

collar market;" (3) "U.S. importers have increased their quantities of inventories of Chinese

product to levels that are particularly significant in the context of current market conditions;" and

(4) "the Chinese industry is very large and growing, is export-oriented, possesses substantial

unused capacity, and has an incentive to increase its production and U.S. exports of unfinished

drill pipe in response to the 2010 U.S. antidumping and countervailing duty orders on Chinese

casing and tubing products." *Id.* at 32.  The Commission based the second finding, as quoted

above, on more detailed findings that it expressed as follows:

> The participation of suppliers of Chinese product in the U.S. market has evolved and
> grown over the period in ways that indicate further expansion is imminent.  During
> the preliminary phase of these investigations importer respondents indicated that
> subject imports were limited to sales to smaller customers to whom domestic
> producers had no interest in making sales.  Information on the record in the final
> phase of these investigations shows this is no longer the case.  Importers of Chinese
> product have recorded sales to the largest U.S. purchasers.  By the end of the period
> examined, most of the largest U.S. customers for drill pipe and drill collars reported
> purchasing subject merchandise.

*Id*. at 28-29 (footnotes omitted).  In the quoted paragraph, the ITC discerned a trend in which

large domestic customers did not buy the Chinese products at the beginning of the period of

investigation but did buy subject merchandise by the end of the POI.  This perceived trend

caused the ITC to conclude that the participation of Chinese suppliers in the U.S. market has

"evolved and grown over the period in ways that indicate further expansion is imminent."  *Id*.

at 28.  The ITC relied on its perceived trend in concluding that "[t]he fact that suppliers of

Chinese product *have broken through a major prior limitation on their reach in the U.S. market*

is an indication that their U.S. market share is poised to increase."  *Id*. at 29 (emphasis added).

In this way, the Commission grounded its threat analysis, in part, on "[s]ubject suppliers'

emergence as providers to even the largest U.S. purchasers [of drill pipe and drill

collars] . . . ."  *Id*.

The record evidence does not support and in fact refutes any finding or inference that only smaller domestic purchasers, as opposed to purchasers the ITC considered "large," were buying subject merchandise at the start of the POI.  The Commission relied on certain testimony given at the Commission's conference during the preliminary phase of the investigation, held on January 21, 2010.  *Id*. at 28 & n.231.  However, that testimony, even as paraphrased in the Commission's preliminary determination and in the Views of the Commission, was not to the effect that large purchasers do not buy *any* subject merchandise; it was instead that the largest domestic purchasers obtained drill pipe and collar predominantly from domestic suppliers.[4]  *See id.*  The Commission overlooked record evidence that purchasers it considered "large" did in fact buy subject merchandise during the first year of the POR.  The Commission identified eight U.S. purchasers of drill pipe and drill collar that it considered to be the largest, according to either the number of drill rigs owned or operated or the value of total purchases of drill pipe and drill collars (domestic and foreign).[5]  *ITC Report: Final Staff Report* II-7, II-8 (PR 213).  Three of

---

[4] The conference testimony of the respondents, as cited by the Commission, [



]

[5] The Commission identified six purchasers of drill pipe and drill collar as the largest according to drill rigs owned or operated: [



] The Commission's list of large purchasers or drill pipe and drill collars by purchase volume during the POR (from all countries) [



] *Drill*
(continued . . .)

these largest purchasers reported having purchased significant quantities of subject merchandise during 2007, the first year of the POI.[6]

The record evidence consisting of large purchasers' questionnaire responses, considered as a whole, also falls short of supporting the ITC's finding that the participation of Chinese suppliers in the U.S. market over the POI broke through a prior limitation to smaller suppliers. Of the eight largest purchasers, three did not purchase any Chinese drill pipe or collar during the POI.[7]  Three others made purchases of Chinese products, but these purchases either ended in 2007 or fell off substantially after 2007, the first year of the POI.[8]  Of the remaining two large

_____

( . . . continued)
*Pipe and Drill Collars from China*, Inv. Nos. 701-TA-474 and 731-TA-1176 (Final), USITC Pub. 4213 (Feb. 2011) ("*ITC Report*"), at II-7 (*Final Staff Report*, CR 523).

[6] The record consisting of responses to purchasers' questionnaires shows [



]

[7] [



]

[8] [

(continued . . .)

purchasers, one had a purchasing pattern that fails to lend support to the Commission's finding

that purchases of subject merchandise began during, and grew over, the POI so as to indicate

imminent "further expansion."[9]

Concerning the remaining (eighth) large purchaser, the three Commissioners who voted

in favor of the affirmative threat determination and the three dissenting Commissioners disagreed

on the significance of a transaction, or a group of related transactions, in early 2010 that involved

this purchaser and a particular importer of subject merchandise.  Redacted Oral

Tr. 8-10(Sept. 30, 2013), ECF No. 93; *ITC Report: Comm'n Views* 40 n.232 (CR 537); *ITC*

*Report: Dissenting Views* 46 n.30 (CR 538).  But even were the court to sustain every inference

the Commission drew from the record facts pertaining to this large purchaser, it still would be

unable to conclude that the record evidence supports the larger finding that participation of

Chinese suppliers has evolved and grown over the POI "in ways that indicate further expansion

is imminent." *ITC Report: Comm'n Views* 28.  The evidence pertaining to the transaction or

transactions occurring in early 2010 involves only one importer and one large domestic

---

( . . . continued)

]

[9] [

]

purchaser; in addition, the record evidence refutes a finding or inference that the transaction or transactions involved were representative or typical.[10]

In summary, from its review of the record evidence in this case, and particularly its review of the evidence contained in the responses to the ITC's purchasers' questionnaire submitted by the domestic purchasers that the ITC considered "large," the court concludes that substantial evidence does not support two findings made by the Commission and two general conclusions the ITC reached on the basis of those two findings.  As discussed above, the impermissible findings were that only smaller domestic purchasers, as opposed to purchasers the ITC considered "large," were buying subject merchandise at the start of the POI and that, during the POI, the participation of Chinese suppliers in the U.S. market broke through a prior limitation to smaller suppliers.  From these erroneous findings, the ITC reached the unsupported conclusion that "[t]he participation of suppliers of Chinese product in the U.S. market has evolved and grown over the period in ways that indicate further expansion is imminent," *ITC Report: Comm'n Views* 28, and the related conclusion that "[t]he fact that suppliers of Chinese product have broken through a major prior limitation on their reach in the U.S. market is an indication that their U.S. market share is poised to increase," *id.* at 29.

---

[10] [



]

Defendant's counsel acknowledged at oral argument that the record lacks substantial evidence to support one or more of the ITC's findings concerning purchasing by large customers during the POR.  According to defendant's argument, the erroneous finding or findings are not critical to the chain of causation, and the court should disregard any error is harmless.  The court disagrees.

A court must review an agency determination on the reasoning the agency puts forth.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  As the court indicated above, the ITC's general finding that "importers of subject merchandise have now become suppliers to even the largest U.S. purchasers and thus have demonstrated access to the full range of the API-grade drill pipe and collar market," which the ITC grounded in the two erroneous findings and invalid conclusion the court has identified, was one of the four reasons the Commission expressed for concluding that subject imports would "increase significantly in absolute terms and relative to domestic consumption and production in the imminent future."  *ITC Report: Comm'n Views* 32.  In turn, the imminent increase in import volumes that the Commission foresaw was integral to the affirmative threat determination.  *Id.* at 37 ("Given that the industry is already in a weakened state, we conclude that, unless antidumping duty and countervailing duty orders are issued, significant volumes of dumped and subsidized imports will gain additional U.S. market share in the imminent future and material injury by reason of subject imports will occur.").  Additionally, the finding of an imminent increase in the volume of subject imports was related to the finding that these increased imports would undersell the domestic product.  *Id.* at 34 ("[W]e conclude that, in the imminent future, the aggressive price competition demonstrated by subject imports at the end of the period examined will likely continue, and the introduction of increased quantities of subject imports, aggressively priced in an effort to gain market share, will put pressure on domestic producers to lower prices in a market recovering from depressed demand.").  The

importance the ITC attached to the erroneous findings and the unwarranted conclusions in reaching its affirmative threat determination does not allow the court to consider the errors to be harmless.

Arguing for affirmance of the affirmative threat determination, defendant-intervenor U.S. Steel maintains that the court can and should conclude that substantial evidence supports the remainder of the Commission's determination even if also concluding that certain findings were not lawful. Relying on the decision of the Court of Appeals for the Federal Circuit ("Court of Appeals") in *Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ("*Nippon Steel*"), U.S. Steel argues that the determination under review in this case should be upheld based on an examination of the record as a whole notwithstanding the potentially unlawful finding or findings. However, *Nippon Steel* was grounded in an evidentiary record distinguishable from that presented in the case at bar. In *Nippon Steel*, the Court of Appeals upheld an affirmative injury determination of the ITC that had been set aside by the Court of International Trade even though concluding that this Court was correct in determining that the ITC had made an "obvious error" when ascertaining the way in which subject merchandise undersold the domestic like product. *Nippon Steel*, 458 F.3d at 1353-54, 1358-59. The Court of Appeals concluded that the affirmative injury determination, despite the error, was supported by an "adequate basis in support of the Commission's choice of evidentiary weight" that required deference to the Commission under the substantial evidence standard. *Id.* at 1358-59. In this case, the Commission's own presentation of its affirmative threat determination causes the court to conclude that the ITC gave significant weight to the factual findings, and the associated conclusions, that the court views as erroneous.

U.S. Steel also argues that the transaction in early 2010 involving the aforementioned eighth large purchaser could have been viewed as a watershed event that signified a meaningful

change for a producer that previously sold only to smaller U.S. customers.  This argument is

unconvincing.  As the court has pointed out, there can be no dispute that the transaction or

transactions in question involved only one importer and one purchaser and did not reflect a

typical sales arrangement.

In conclusion, the court must reject as unsupported by substantial record evidence the

ITC's finding that only smaller domestic purchasers, as opposed to purchasers the ITC

considered "large," were buying subject merchandise at the start of the POI and the ITC's

finding that, during the POI, the participation of Chinese suppliers in the U.S. market over the

POI broke through a prior limitation to smaller suppliers.  The court must also reject the two

conclusions the ITC reached based on these findings, which were that "[t]he participation of

suppliers of Chinese product in the U.S. market has evolved and grown over the period in ways

that indicate further expansion is imminent," *ITC Report: Comm'n Views* 28, and the related

conclusion that "[t]he fact that suppliers of Chinese product have broken through a major prior

limitation on their reach in the U.S. market is an indication that their U.S. market share is poised

to increase," *id.* at 29.  Because, as discussed above, it is apparent from the Views of the

Commission that these erroneous findings and unwarranted conclusions were important to the

affirmative threat determination, the Commission must reconsider that determination on the

whole, in the absence of these findings and conclusions.

### 2.  Additional Explanation Is Required on Two Other Aspects of the Commission's Affirmative Threat Determination

Although the erroneous findings and conclusions identified above are alone sufficient to

require the ITC to reconsider its affirmative threat determination, the court also sees a need for

the ITC to provide additional explanation on two other aspects of that determination.

The first of the four findings the ITC presented to support its conclusion that subject imports would increase significantly in volume was as follows: "subject imports held a *substantial* share of the U.S. market *throughout* the period examined, a share that *grew* in first-half 2010." *ITC Report: Comm'n Views* 32 (emphasis added).  The statement of the finding summarizes earlier discussion in which the ITC characterized the market share of imports of subject finished drill pipe and drill collars as fluctuating and "significant."  *Id.* at 28.  It is not clear whether the Commission, in characterizing the market share of subject imports as "substantial," was referring only to finished imports, which it discussed, or also to unfinished products.  The data the ITC cited earlier referred only to finished products.  As to the finished products, the use of the term "substantial" to describe the market share is questionable as applied to the POI as a whole, in which that market share fluctuated considerably, at times to levels that would not appear to qualify as "substantial," and never exceeded a particular threshold.  *Id.* Moreover, the Commission's statement that the market share "grew" in first-half 2010 must be interpreted in light of those data, which showed that the market share of finished subject merchandise grew from second-half 2009 to first-half 2010 but in first-half 2010 still was considerably less than it was in first-half 2009.  *See id.* at 28 (citing *Final Staff Report* at Table C-2).  The same data showed that the increase in first-half 2010 must be seen in the context of a precipitous drop in that market share occurring in second-half 2009.  *See id.*  In view of the actual data, the court directs the Commission to explain why, and to what extent, it based its overall determination related to likely future import volume on its stated findings that the U.S. market share of subject merchandise was "substantial" throughout the POI and "grew" in first-half 2010.[11]  In doing so, the ITC should be mindful of the statutory directive that the ITC,

---

[11] In a single paragraph in the Views of the Commission, the ITC tied its findings as to

(continued . . .)

when evaluating a threat of material injury, must consider whether there has been "a significant rate of *increase* of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports."  19 U.S.C. § 1677(7)(F)(i)(III) (emphasis added).

A second aspect of the final threat determination requiring additional explanation is the ITC's basing of conclusions as to likely future import volume on the finding that "U.S. importers have increased their quantities of inventories of Chinese product to levels that are particularly significant in the context of current market conditions."  *ITC Report: Comm'n Views* 32.  The data the ITC cited for its finding, which it presented on page 41 of the Views of the Commission and obtained from Table C-2 of the Final Staff Report, show a sizable increase in importers' inventories only from 2007 to 2008 and show modest declines thereafter.  Citing a different table in the Final Staff Report (Table II-4, showing inventory of subject finished products held by "purchasers,"), the three dissenting Commissioners concluded that "[w]ith regard to inventories of the subject merchandise, there was no significant increase in inventories of subject product held by U.S. importers or purchasers over the period examined."  *ITC Report: Dissenting Views* 45.  The dissenting Commissioners added that "[i]n fact, while inventories of finished products from U.S. sources predictably increased from 2007 to 2009 as demand declined, inventories of subject imports of finished products dropped substantially over the same period."  *Id.* (footnote omitted).  The court directs the ITC to provide additional explanation of its stated finding in light of all of the relevant evidence of record, including evidence that may detract from that finding.

---

( . . . continued)
market share directly to one of the conclusions the court found erroneous for the reasons discussed above, *i.e.*, the finding that the U.S. market share of Chinese suppliers is "poised to increase."  *ITC Report: Comm'n Views* 29.

In directing the ITC to provide additional explanations for two of its findings, the court does not preclude the ITC, on remand, from reconsidering those or any other findings upon which the ITC reached its final affirmative threat determination.

### III. CONCLUSION AND ORDER:  ON REMAND, THE ITC MUST RECONSIDER ITS AFFIRMATIVE THREAT DETERMINATION AND ISSUE A REDETERMINATION THAT IS SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE

Because of the importance the ITC placed on the two erroneous findings and unwarranted conclusions discussed previously in this Opinion, the court directs the ITC to reconsider its affirmative threat determination on the whole, absent those findings and conclusions, and issue a redetermination upon remand that is supported by substantial evidence on the record considered as a whole.  For the reasons also discussed above, the court directs the Commission to provide additional explanation on two other aspects of the affirmative threat determination.

Therefore, upon consideration of the *Drill Pipe and Drill Collars From China*, 76 Fed. Reg. 11,812 (Mar. 3, 2011); *Drill Pipe and Drill Collars from China*, Inv. Nos. 701-TA-474 and 731-TA-1176 (Final), USITC Pub. 4213 (Feb. 2011), and all papers and proceedings had herein, it is hereby

**ORDERED** that the U.S. International Trade Commission ("ITC") shall file with the court a remand redetermination that complies fully with this Opinion and Order and is supported by substantial evidence on the record considered as a whole; and it is further

**ORDERED** that the ITC shall file its remand redetermination within ninety (90) days of this Opinion and Order, plaintiff and defendant-intervenors shall have thirty (30) days from the filing of that remand redetermination to comment thereon, and defendant shall have fifteen (15) days from the filing of the last comment to submit any reply.


                                        /s/ Timothy C. Stanceu
                                        Timothy C. Stanceu
                                        Judge


Dated: August 19, 2013
       New York, New York