Slip Op. 14-130

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DOWNHOLE PIPE & EQUIPMENT, LP**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES and UNITED STATES INTERNATIONAL TRADE COMMISSION**, <br><br> Defendants, <br><br> and <br><br> **VAM DRILLING USA, TEXAS STEEL CONVERSIONS, INC., ROTARY DRILLING TOOLS, TMK IPSCO, and UNITED STATES STEEL CORPORATION**, <br><br> Defendant-intervenors. | **Before: Timothy C. Stanceu, Chief Judge** <br><br> **Court No. 11-00080** |

## OPINION

[Affirming a redetermination that the U.S. International Trade Commission issued in response to a remand order in litigation under the antidumping and countervailing duty laws]

Date: November 10, 2014

*Mark B. Lehnardt*, Lehnardt & Lehnardt, LLC, of Liberty, MO and *Irene H. Chen*, Chen Law Group, LLC, of Rockville, MD, argued for plaintiff Downhole Pipe & Equipment, LP.

*David Goldfine*, Attorney-Advisor, U.S. International Trade Commission, of Washington, DC, argued for defendants.

*Roger B. Schagrin* and *John W. Bohn*, Schagrin Associates, of Washington, DC, for defendant-intervenors VAM Drilling USA, Texas Steel Conversion, Inc., Rotary Drilling Tools, and TMK IPSCO.

*Robert E. Lighthizer*, *Stephen P. Vaughn*, and *James C. Hecht*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Stanceu, Chief Judge:  Before the court is a determination ("Remand Redetermination") issued by the U.S. International Trade Commission ("ITC" or the "Commission") in response to the court's remand order in *Downhole Pipe & Equipment, LP v. United States*, 37 CIT __, 963 F. Supp. 2d 1335 (2013) ("*Downhole Pipe I*").  *Views of the Comm'n on Remand* (Dec. 11, 2013), ECF No. 96 (public version) ("*Remand Redetermination*").[1]  In *Downhole Pipe I*, the court reviewed the ITC's final determination that the domestic industry manufacturing steel drill pipe and steel drill collars, although not experiencing present material injury, was threatened with material injury by imports of finished and unfinished steel drill pipe and steel drill collars (the "subject merchandise") from the People's Republic of China ("China" or the "PRC").  *See Drill Pipe & Drill Collars From China*, 76 Fed. Reg. 11,812 (Int'l Trade Comm'n Mar. 3, 2011) ("*Final Injury Determination*"); *Drill Pipe & Drill Collars from China*, Inv. Nos. 701-TA-474 and 731-TA-1176 (Final), USITC Pub. 4213 (Feb. 2011) ("*ITC Publ'n*"), *available at* http://www.usitc.gov/trade_remedy/731_ad_701_cvd/investigations/2010/ drill_pipe_from_china/final/PDF/pub4213.pdf (last visited Nov. 4, 2014).  The court remanded the Commission's affirmative threat determination for reconsideration, principally upon the conclusion that two of the Commission's findings of fact were unsupported by substantial evidence on the record of the investigation.  *Downhole Pipe I*, 37 CIT at __, 963 F. Supp. 2d at 1348.  On remand, the ITC reconsidered its earlier determination in the absence of the unsupported findings.  The Commission again reached a negative determination on material

---

[1] Citations in this Opinion are to the public version of each document unless otherwise indicated.

injury but reversed its prior affirmative determination with respect to threat. *Remand Redetermination* 3.

The defendant-intervenors in this case, VAM Drilling USA, Texas Steel Conversion, Inc., Rotary Drilling Tools, TMK IPSCO, and United States Steel Corporation, are domestic drill pipe producers. *Id.* at 6. They raise various objections to the Remand Redetermination and advocate a second remand for reconsideration of the ITC's negative threat determination. Comments of Def.-intervenors; VAM Drilling USA; Texas Steel Conversion, Inc.; Rotary Drilling Tools; TMK IPSCO; & U.S. Steel Corp. Regarding the Remand Results (Jan. 27, 2014), ECF No. 105 ("Def.-intervenors' Comments"). For the reasons discussed herein, the court rejects defendant-intervenors' arguments and concludes that the Remand Redetermination must be affirmed.

## I. BACKGROUND

The background of this case is presented in the court's prior opinions in this action and is supplemented herein. *Downhole Pipe I*, 37 CIT at __, 963 F. Supp. 2d at 1338; *Downhole Pipe & Equipment Co. v. United States*, 37 CIT __, __, Slip Op.14-23 at 2-4 (Feb. 25, 2014) (denying motion for rehearing).

The ITC initiated its injury and threat investigation on January 6, 2010. *Drill Pipe From China*, 75 Fed. Reg. 877, 878 (Int'l Trade Comm'n Jan. 6, 2010) (initiation). The Commission conducted its investigation on the basis of data from a period of investigation ("POI") from January 2007 to June 2010. *Drill Pipe & Drill Collars from China: Staff Report to the Comm'n on Investigation Nos. 701-TA-474 and 731-TA-1176* (Final) at I-30 (Table I-4) (Jan. 26, 2011) (Pub. Admin.R.Doc. No. 213) (Conf. Admin.R.Doc. No. 523) ("*Final Staff Report*").

The Commission published the preliminary results of its investigation on March 8, 2010,

determining that, for purposes of sections 703(a) and 733(a) of the Tariff Act of 1930 (the

"Tariff Act"), 19 U.S.C. §§ 1671b(a), 1673b(a), "there is a reasonable indication that an industry

in the United States is threatened with material injury by reason of imports from China of drill

pipe and drill collars."[2]  *Drill Pipe & Drill Collars from China*, 75 Fed. Reg. 10,501 (Int'l Trade

Comm'n Mar. 8, 2010) (preliminary results).  The International Trade Administration, U.S.

Department of Commerce ("Commerce" or the "Department"), determined, pursuant to sections

705(a) and 735(a) of the Tariff Act, 19 U.S.C. §§ 1671d(a), 1673d(a), that drill pipe and drill

collars were being sold at less than fair value and that the Chinese producers received

countervailable subsidies. *Drill Pipe From the People's Republic of China: Final Determination*

*of Sales at Less Than Fair Value & Critical Circumstances*, 76 Fed. Reg. 1,966 (Int'l Trade

Admin. Jan. 11, 2011); *Drill Pipe From the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*,

76 Fed. Reg. 1,971 (Int'l Trade Admin. Jan. 11, 2011).  Subsequently the ITC, reaching a

negative determination on injury and an affirmative determination on threat pursuant to sections

705(b) and 735(b) of the Tariff Act, 19 U.S.C. §§ 1671d(b), 1673d(b), published its final

determination on injury and threat concurrently with the publication of antidumping and

countervailing duty orders on March 3, 2011. *Drill Pipe and Drill Collars From China*, 76 Fed.

Reg. 11,812 (Int'l Trade Comm'n Mar. 3, 2011) ("*Final Injury Determination*"); *Drill Pipe*

*From the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 11,757 (Int'l

---

[2] All statutory citations are to the relevant provisions the 2006 edition of the U.S. Code, unless otherwise indicated.

Trade Admin. Mar. 3, 2011); *Drill Pipe From the People's Republic of China: Countervailing*

*Duty Order*, 76 Fed. Reg. 11,758 (Int'l Trade Admin. Mar. 3, 2011).

Plaintiff Downhole Pipe & Equipment, LP, a Chinese producer of the subject

merchandise, initiated this action contesting the ITC's final affirmative threat determination by

filing a summons on April 1, 2011 and a complaint on April 29, 2011.  Summons, ECF No. 1;

Compl., ECF No. 8.  Plaintiff subsequently moved for judgment on the agency record pursuant

to USCIT Rule 56.2.  Pl.'s R. 56.2 Mot. for J. on the Agency R. (Oct. 19, 2011), ECF No. 28.  In

*Downhole Pipe I*, the court concluded that the contested determination relied in part on two

factual findings that were not supported by substantial evidence on the administrative record and

also directed the Commission to provide further explanation with respect to two other aspects of

the affirmative threat determination.[3]  *Downhole Pipe I*, 37 CIT at __, 963 F. Supp. 2d

at 1344-47.

In reaching a negative determination on threat, the Remand Redetermination incorporated

by reference, and adopted in its entirety, a section of the final ITC publication presenting the

---

[3] The U.S. International Trade Commission ("ITC" or the "Commission") had relied in part on a finding that U.S. sales of the subject merchandise had been confined to small purchasers at the beginning of the period of investigation ("POI") and a finding that importers had "broken through a major prior limitation on their reach in the U.S. market" by successfully targeting sales to large firms toward the end of the POI.  *Drill Pipe and Drill Collars from China* at 29, Inv. Nos. 701-TA-474 and 731-TA-1176 (Final), USITC Pub. 4213 (Feb. 2011) ("*ITC Publ'n*"), *available at* http://www.usitc.gov/trade_remedy/731_ad_701_cvd/investigations/ 2010/drill_pipe_from_china/final/PDF/pub4213.pdf (last visited Nov. 4, 2014).  In *Downhole Pipe & Equipment, LP v. United States*, 37 CIT __, 963 F. Supp. 2d 1335 (2013) ("*Downhole Pipe I*"), the court concluded that the ITC had relied on these two factual findings, which the court held impermissible, in determining that the U.S. market share of Chinese imports was "poised to increase."  *Id.* at __, 963 F. Supp. 2d at 1342-45.  The court ordered clarification of the ITC's findings that "'subject imports held a substantial share of the U.S. market throughout the period examined, a share that grew in first-half 2010'" and "'U.S. importers have increased their quantities of inventories of Chinese product to levels that are particularly significant in the context of current market conditions.'"  *Id.* at __, 963 F. Supp. 2d at 1346-47 (citing *ITC Publ'n*, Original Comm'n Views 32).

opinion of three Commissioners who had dissented from the Commission's original affirmative

threat determination ("Original Dissenting Views").  *Remand Redetermination* 7 (citing *ITC*

*Publ'n*, Original Dissenting Views 41-62).  In light of the reversal, the Remand Redetermination

did not respond to the court's order seeking additional explanation with respect to certain aspects

of the original majority's final affirmative threat determination.[4]

## II. DISCUSSION

The court exercises jurisdiction according to section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), under which the Court of International Trade is granted exclusive

jurisdiction over actions brought under section 516A of the Tariff Act, 19 U.S.C. § 1516a.  In

reviewing the Remand Redetermination, the court will "hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The court considers evidence on the

record in its entirety, and a determination as to the sufficiency of evidence "must take into

account whatever in the record fairly detracts from its weight."  *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488 (1951).  Where evidence is ambiguous or subject to different

weightings of the record, substantial evidence may consist of "something less than the weight of

the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does

_____

[4] "Since we have adopted the Original Dissenting Views in their entirety, the Court's remand instructions do not apply to our negative determinations on remand."  *Views of the Comm'n on Remand 7* (Dec. 11, 2013), ECF No. 96 ("*Remand Redetermination*").  In addition, the ITC addressed two errors in the Final Staff Report pointed out in the court's remand order. *Id.* at 6 n.16.

not prevent an administrative agency's finding from being supported by substantial evidence."

*Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620 (1966).

Under sections 705(b)(1) and 735(b)(1) of the Tariff Act, 19 U.S.C. §§ 1671d(b)(1),

1673d(b)(1), the Commission is required to determine whether a domestic industry or industries

are materially injured or threatened with material injury "by reason of imports, or sales (or the

likelihood of sales)" of the merchandise for which Commerce has made an affirmative

determination of subsidy or sales at less than fair value.  Section 771(7)(A) of the Tariff Act

defines material injury as harm that "is not inconsequential, immaterial, or unimportant."

19 U.S.C. § 1677(7)(A).

In making its determination on threat, the ITC is required to "consider, among other

relevant economic factors," eight specific factors.  19 U.S.C. § 1677(7)(F)(i).[5]  The statute also

identifies a ninth, nonspecific threat factor: "any other demonstrable adverse trends that indicate

---

[5] The specific economic factors prescribed for the threat determination are as follows:
(1) "if a countervailable subsidy is involved . . . the nature of the subsidy . . . and whether
imports of the subject merchandise are likely to increase," 19 U.S.C. § 1677(7)(F)(i)(I); (2) "any
existing unused production capacity or imminent, substantial increase in production capacity in
the exporting country indicating the likelihood of substantially increased imports of the subject
merchandise into the United States, taking into account the availability of other export markets to
absorb any additional exports," *id.* § 1677(7)(F)(i)(II); (3) "a significant rate of increase of the
volume or market penetration of imports of the subject merchandise indicating the likelihood of
substantially increased imports," *id.* § 1677(7)(F)(i)(III); (4) "whether imports of the subject
merchandise are entering at prices that are likely to have a significant depressing or suppressing
effect on domestic prices, and are likely to increase demand for further imports," *id.*
§ 1677(7)(F)(i)(IV); (5) "inventories of the subject merchandise," *id.* § 1677(7)(F)(i)(V); (6) "the
potential for product-shifting if production facilities in the foreign country, which can be used to
produce the subject merchandise, are currently being used to produce other products," *id.*
§ 1677(7)(F)(i)(VI); (7) "the likelihood that there will be increased imports, by reason of product
shifting, if there is an affirmative determination by the Commission . . . with respect to either the
raw agricultural product or the processed agricultural product" (not relevant to this case), *id.*
§ 1677(7)(F)(i)(VII); and (8) "the actual and potential negative effects on the existing
development and production efforts of the domestic industry, including efforts to develop a
derivative or more advanced version of the domestic like product," *id.* § 1677(7)(F)(i)(VIII).

the probability that there is likely to be material injury by reason of imports (or sale for

importation) of the subject merchandise (whether or not it is actually being imported at the

time)." *Id.* § 1677(7)(F)(i)(IX).

Defendant-intervenors claim that the ITC's findings regarding four of the nine factors

enumerated in 19 U.S.C. § 1677(7)(F)(i) are unsupported by substantial evidence and that,

because the Remand Redetermination relies upon these findings, the court must order another

remand in this case.[6]  Def.-intervenors' Comments 4.  They organize their comments under two

general objections to the Remand Redetermination.  First, they claim that the ITC's finding on

the likely volume and market share of subject imports lacked the support of substantial record

evidence.  *Id.* at 3.  Second, they claim that the ITC's analysis of the U.S. industry's financial

performance was fundamentally flawed.  *Id.* at 27-29.  At oral argument, the court asked

whether, as it appeared from defendant-intervenors' comments on the Remand Redetermination,

the second claim was a challenge the ITC's negative injury determination.  Redacted Tr. of

Confidential Oral Arg. at 9 (July 30, 2014), ECF No. 117 ("Oral Tr.").  In response, counsel for

defendant-intervenors waived the second claim to the extent that the claim is interpreted to

challenge the injury determination but expressly declined to waive this claim to the extent that it

applies to the threat determination.  *Id.* at 10.

_____

[6] In their comments on the Remand Redetermination, defendant-intervenors identify the four statutory factors under which they contend the Commission made impermissible findings as follows: " . . . existing unused production capacity, any 'significant rate of increase in the volume or market penetration of imports of the subject merchandise,' inventories of subject merchandise, [and] 'whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports.'"  Comments of Def.-intervenors; VAM Drilling USA; Texas Steel Conversion, Inc.; Rotary Drilling Tools; TMK IPSCO; & U.S. Steel Corp. Regarding the Remand Results 3-4  (Jan. 27, 2014), ECF No. 105 (public) ("Def.-intervenors' Comments") (citing 19 U.S.C. §1677(7)(F)(i)(II-V)).

A.  The Court Rejects Defendant-intervenors' Arguments Pertaining to Likely Volume and
Market Share of Subject Imports and Existing Unused Production Capacity of Chinese Producers

In making a threat determination, the ITC is required to consider, among several other factors, "any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports . . . ." 19 U.S.C. § 1677(7)(F)(i)(II).  The Commission noted that "Chinese capacity increased overall during the period examined, with capacity utilization dropping to low levels by the end of the period, so that reported excess capacity is extensive."  *ITC Publ'n*, Original Dissenting Views 43 (footnote omitted).  The ITC added that "[f]or finished products, reported excess capacity in 2009 . . . slightly exceeded apparent U.S. consumption in that year."  *Id.* at 43-44.  The ITC concluded, however, that the existing unused production capacity in China did not indicate "a likelihood of substantially increased imports of the subject merchandise into the United States, given the demonstrated ability of other export markets to absorb any additional exports from China."  *Id*. at 45.

In claiming generally that the ITC's finding on the likely volume and market share of subject imports was unsupported by substantial record evidence, defendant-intervenors object that "[t]he Commission's finding that Chinese excess capacity would not imminently lead to increased Chinese imports and market penetration was unreasonable and lacked substantial evidence to support it."  Def.-intervenors' Comments 5.  They make five specific arguments in support of this objection, *id.* at 5-26, each of which the court finds unpersuasive for the reasons discussed below.

1.  Defendant-intervenors' Argument Mischaracterizes the Commission's Finding on Third
Country Export Markets

Defendant-intervenors first argue that "[t]he current majority's finding that 3rd-country

export markets could 'absorb any additional exports from China' was not supported by

substantial evidence."  Def.-intervenors' Comments 6.  According to their argument, the ITC

"based this on the fact that the proportion of the Chinese industry's total exports that were

headed to the United States had declined" during the POI.  *Id*.  They maintain that "[t]he

undisputed fact that Chinese producers' unused capacity was so 'extensive' by the end of the

POI . . . showed that their export markets were inadequate to absorb their surplus," *id.* (citations

omitted), and that "[t]he new Commission majority failed to identify any reason to believe that

available third-country demand was willing or able to absorb any of this amount of excess

capacity, let alone all of it," *id.* at 7.  Further, defendant-intervenors submit that "[t]he finding

that third-country export markets could 'absorb any additional exports from China' did not rest

on substantial evidence[] and therefore could not reasonably support its conclusion that rising

Chinese exports would bypass the U.S. market in the future."  *Id.* at 8.

Defendant-intervenors' argument mischaracterizes the Commission's finding on existing

unused production capacity.  The ITC did not find that third country export markets would

necessarily absorb "any additional exports from China" that might result from future utilization

of that capacity.  The ITC found instead that the existing unused production capacity did not

indicate a likelihood of substantially increased imports of the subject merchandise into the

United States "given the demonstrated ability of other export markets to absorb any additional

exports from China."  *ITC Publ'n*, Original Dissenting Views 45.  In formulating its conclusion

in this way, the ITC adhered to the language of the statute rather than predicting that third

country markets necessarily would absorb any future increase in exports of Chinese drill pipe

and drill collar that might result from increased capacity utilization. 19 U.S.C.

§ 1677(7)(F)(i)(II).  Rather than making the prediction that defendant-intervenors argue it made,

the ITC referred to the "*demonstrated* ability of other export markets to absorb any additional

exports from China," *id.* (emphasis added), thereby alluding to record data on the past pattern of

exports, i.e., the pattern that third country markets generally had absorbed an increasing share of

total Chinese exports of drill pipe and drill collars during the POI while the U.S. share of total

exports declined.

Moreover, the Commission's finding that existing unused production capacity in China

would not likely result in substantially increased exports of Chinese drill pipe and collars did not

rest solely on consideration of the demonstrated ability of third country export markets to absorb

additional Chinese exports.  The ITC also considered record information pertaining to conditions

of competition existing in the United States during the POI.  As the Commission explained,

"[t]he issue before us, however, is not simply the amount of excess capacity that currently exists

in China but rather whether, given the conditions of competition in the U.S. market, the Chinese

industry is likely to use that excess capacity to substantially increase shipments to the U.S.

market." *ITC Publ'n*, Original Dissenting Views 44.  The Commission gave several reasons for

its conclusion that "such an outcome is unlikely." *Id*.

The ITC relied, first, on a number of related findings to support its conclusion that the

Chinese industry is unlikely to use its excess capacity to substantially increase shipments to the

U.S. market.  It found that Chinese exporters had not reported a "surge of exports" during the

POI, that exports of finished products (which the ITC found to have constituted the substantial

majority of subject imports during the POI) had increased only moderately between 2007 and

2008 before declining precipitously in 2009, that the U.S. market share of the Chinese finished

products had declined over the POI, and that imports of subject unfinished products did not surge

between 2007 and 2009.  *Id*.  Concerning the increase in subject finished exports that occurred

from 2007 to 2008, the ITC reasoned that "[t]o the extent that any increase occurred, it did so

against the backdrop of an overheated demand environment, which is not likely to recur in the

imminent future," and which was "characterized by extended lead times of U.S. producers in

2008 compared to importers of the subject products."  *Id.*  The ITC further reasoned that

"[b]ecause subject imports declined in volume in 2009 (and, in the case of finished products, in

market share as well) when demand was weak, there is no reason to expect a surge in subject

import volume and market share in the imminent future, inasmuch as demand and domestic

producers' lead times have not yet returned to the levels they reached during the period when

those trends were last observed."  *Id.* (footnotes omitted).

    With respect to the third country markets, the ITC found that "although the Chinese

industry can be characterized as export-oriented, the Chinese industry is not very reliant on the

U.S. market compared to other markets[] and did not increase significantly the share of its

exports going to the U.S. market during the period examined."  *Id.*  The Commission found that

the percentage of the total Chinese exports of finished drill pipe and collar products exported to

the United States increased only slightly between 2007 and 2009 "and was less than the share of

shipments going to non-U.S. markets throughout the period examined."  *Id.* at 44-45 (footnote

omitted).  It found, further, that the percentage of responding Chinese producers' shipments of

subject finished products going to the United States declined between 2007 and 2008, "a period

during which demand in the U.S. market was generally strong," and that the share going to "all

other markets" increased "sharply" in 2008 and increased "even more markedly" in 2009.  *Id.*

at 45.

In summary, the court concludes from the entirety of the ITC's discussion of the existing unused production capacity of Chinese producers that defendant-intervenors are attempting to challenge a finding the ITC did not actually make.  To that extent, defendant-intervenors' argument must be rejected.

At oral argument, defendant-intervenors argued that the ITC, in making its finding as to existing unused capacity, erred in overlooking record data demonstrating that, viewed in absolute terms as opposed to relative terms, the volume of exports of Chinese drill pipe and drill collars shipped to third country export markets essentially remained unchanged during the POI.  Oral Tr. at 16-17 (describing *Final Staff Report* at VII-11 (Table VII-3b)).  This precise argument does not appear in defendant-intervenors' comments on the Remand Redetermination and therefore is not before the court.  Even were the court to consider this argument, it still would be compelled to reject it.  Regardless of whether Chinese exports of drill pipe and drill collars to third countries, in volume terms, remained essentially level during the POI, the fact that an increasing share went to third country markets while the U.S. share declined still constitutes relevant evidence in support of the Commission's finding that the existing unused capacity would not likely lead to substantially increased shipments of subject merchandise to the U.S. market, given the demonstrated ability of third country markets to absorb Chinese exports of drill pipe and drill collars.

## 2.  The Court Rejects Defendant-intervenors' Argument Pertaining to an Overheated Demand Environment and the Lead Times of Domestic Suppliers

Next, defendant-intervenors argue that "the Commission's finding that Chinese imports would likely gain market share only in an 'overheated demand environment' in which U.S. producers had 'extended lead times' was unreasonable and lacked substantial evidence to support it."  Def.-intervenors' Comments 9.  They assert that "the Commission failed to reasonably

analyze—or even in some cases to recognize—several significant changes that had transpired

since the 2007 to 2008 period," adding that "[t]hese changes indicated that producers, exporters

and importers of subject merchandise were more aggressive than in 2007 to 2008[] and could in

fact increase their market share in periods of low demand when the U.S. industry had relatively

short lead times." *Id.* at 10.  In referring to "changes," defendant-intervenors explain that

"Chinese producers were operating a[t] nearly full capacity in 2007 and for most of 2008, but by

2010 they had 'extensive' excess capacity." *Id.* (footnote omitted).  Repeating their argument

that the ITC erroneously found that export markets could absorb any additional exports (which

the court rejects for the reasons discussed previously), they maintain that "facilitated by all this

excess capacity, subject exports and imports actually had in fact started to surge by the end of the

POI." *Id.* at 11.  According to their argument, the Commission, having failed to analyze these

changes, could not reasonably draw a "'connection between the facts found and the choices

made.'" *Id.* at 10 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

They conclude by contending that "the Commission failed to reasonably account for evidence

that 'fairly detracts' from the weight of its base assumption that only overheated demand could

lead to surging subject imports because that was what had happened before." *Id.* at 14 (citation

omitted).

        The court is not persuaded by defendant-intervenors' argument.  Defendant-intervenors

once again mischaracterize a statement by the ITC.  Moreover, in considering the likelihood of a

substantial increase in subject imports in the imminent future, the Commission did not fail to

analyze the relevant record evidence, including the record evidence to which defendant-

intervenors direct the court's attention.

Defendant-intervenors attempt to challenge an ITC finding that Chinese imports likely would gain market share only in an overheated demand environment in which U.S. producers had extended lead times.  *Id.* at 9.  The actual statement by the ITC, however, was narrower and more nuanced than as interpreted by defendant-intervenors: "Because subject imports declined in volume in 2009 (and, in the case of finished products, in market share as well) when demand was weak, there is no reason to expect a surge in subject volume and market share in the imminent future, inasmuch as demand and domestic producers' lead times have not yet returned to the levels they reached during the period when those trends were last observed."  *ITC Publ'n*, Original Dissenting Views 44 (footnote omitted).

The ITC referred to the unlikelihood of an imminent "surge" in import volume and market share, not merely a "gain" in market share, as defendant-intervenors paraphrase the Commission's statement.  Def.-intervenors' Comments 9.  The Commission spoke in the context of the prospect of a return to the overheated demand levels and extended lead times that occurred concurrently with the increase in volume of subject imports from 2007 to 2008, not simply any increase in demand.  In this respect, defendant-intervenors' argument that the ITC failed to recognize that the changes they identify "indicated that producers, exporters and importers of subject merchandise were more aggressive than in 2007 to 2008[] and could in fact increase their market share in periods of low demand when the U.S. industry had relatively short lead times," *id.* at 10, is misguided.

The ITC's statement referring to "demand and domestic producers' lead times" that "have not yet returned to the levels they reached during the period when those trends were last observed," *ITC Publ'n*, Original Dissenting Views 44 (footnote omitted), was part of a broader discussion in which the ITC concluded that, given the conditions of competition in the U.S.

market, the Chinese industry was not likely to use its excess capacity to increase substantially

shipments of subject merchandise to the United States, *id.*  In presenting its analysis, the

Commission mentioned, specifically, the extensive level of existing unused capacity, the volume

trends of subject imports during the POI, and the record evidence that third country markets had

absorbed an increasing share of total exports of drill pipe and drill collars.  *Id.* at 44-45.

As the court discussed previously, the ITC found that the increase in import volume that

took place early in the POI—which the Commission did not consider to be a substantial

increase—occurred during a period of overheated demand in which the extended lead times were

evident.  *ITC Publ'n*, Original Dissenting Views 44.  As the court also discussed previously, the

Commission concluded that a substantial increase in subject imports in the imminent future was

unlikely for several reasons.  The initial reason it gave was this: "[f]irst, responding firms did not

report a surge of exports to the U.S. market during the period examined."  *Id.*  Specifically, the

Commission found that subject finished products increased "only modestly" from 2007 to 2008,

declined substantially in 2009, and that subject unfinished products "did not surge between 2007

and 2009."  *Id.* (footnote omitted).  The Commission reasonably considered the absence of a

surge of subject imports during the POI to be an indicator, among others, that a surge was not

likely to occur in the imminent future.  The ITC discussed the overheated demand environment

and the lead times only as an ancillary point, in the context of the limited increase that occurred

between 2007 and 2008: "*To the extent* that any increase occurred, it did so against the backdrop

of an overheated demand environment, which is not likely to recur in the imminent future."  *Id.*

(emphasis added).  The Commission added that "this demand environment was characterized by

extended lead times of U.S. producers in 2008 compared to importers of the subject products,

which we find accounted for any increase in imports that occurred."  *Id.*  The Commission's

discussion suggests that the scale of the increase in subject imports during the POI, which the

Commission considered too small to constitute a "surge," was at least as important to the

analysis as the demand environment in which that increase took place.

In making their argument concerning overheated demand conditions and lead times,

defendant-intervenors assert that "subject exports and imports actually had in fact started to

surge by the end of the POI," pointing to an increase from the second half of 2009 to first-half

(i.e., "interim") 2010 that occurred even though "demand remained relatively weak and U.S.

producers were not experiencing extended lead times."  Def.-intervenors' Comments 11.  They

maintain that "[s]ince there was no evidence of seasonality that would distort a comparison

between the second half of 2009 and the first half of 2010, as the original majority

determined . . . , this upsurge showed that Chinese producers were racing back into the U.S.

market."  *Id.* at 11-12 (citation omitted).  They argue that during the twelve-month period

consisting of second-half 2009 and interim 2010, "subject import volume and market share

increased at an even more rapid rate than before, even though demand was improving" and that

"[t]his showed that subject imports were capable of rapidly increasing in both volume and

market share even absent an overheated demand environment."  *Id.* at 12.  Acknowledging the

ITC's observation that "finished subject imports had a lower volume and less U.S. market share

in the first half of 2010 than in the first half of 2009," defendant-intervenors object that "the

Commission failed to provide a reasonable explanation of why it considered the comparison

between the first half of 2010 and the first half of 2009 more significant than the more recent

data."  *Id.*  Taking issue with the Commission's comparing interim 2009 data with interim 2010

data, they complain that "[t]he only explanation the Commission here offered was that this was

the Commission's 'typical' methodology."  *Id.* at 13 (citing *Remand Redetermination* 10 n.42).

Defendant-intervenors' argument that the Commission failed to recognize the significance of the increase in subject imports from second-half 2009 to interim 2010 is also unpersuasive.  Regardless of the conditions in which the ITC found the increase to have occurred, i.e., in the absence of overheated demand, the court finds no basis to conclude that the Commission improperly disregarded evidence of that increase.  Although defendant-intervenors characterize the increase from second-half 2009 to interim 2010 as a "surge" in subject imports, their characterization is open to question in light of record evidence, cited by the ITC, demonstrating that the subject import volume in interim 2010 still was substantially below the level that was present in interim 2009.  *ITC Publ'n*, Original Dissenting Views 41 & n.3.  It was reasonable for the Commission to accord significance to this evidence as it considered the record as a whole, and it was reasonable for the Commission not to characterize the interim 2010 increase in imports as a "surge."  *See id.*, Original Dissenting Views 45 & n.26.

### 3.  The ITC's Finding that Changes in Inventory Levels Do Not Indicate an Imminent Threat to Domestic Producers is Supported by Substantial Evidence

In attacking what they consider, erroneously, to be the Commission's finding pertaining to an overheated demand environment and extended lead times, defendant-intervenors argue that certain changes in inventories of subject merchandise showed a likely increase in subject imports.  Def.-intervenors' Comments 14.  Specifically, they argue that "[a]s Petitioners pointed out in the investigation, and the current majority acknowledged, by the end of the POI, the ratio of importers' inventories of subject merchandise to total demand was high and increasing."  *Id.* at 15 (footnote omitted).  They go on to argue that "[t]his overhang of subject merchandise would be available to compete in the marketplace in the future with new U.S.-made products, harming U.S. sales in the imminent future."  *Id.*

The ITC, as required by 19 U.S.C. § 1677(7)(F)(i)(V), considered "inventories of the

subject merchandise" in making its threat determination.  Defendant-intervenors' argument as to

importers' inventories is essentially that the ITC erred in not finding an indication of threat by

comparing importer inventory levels with total demand.  In the Remand Redetermination, the

ITC addressed and rejected this argument, which had been presented to the Commission by

United States Steel Corporation.  *Remand Redetermination* 8 n.25.  In its response, the ITC

acknowledged that "there was a significant increase in the ratio of U.S. importers' inventories of

subject imports relative to apparent U.S. consumption throughout the POI" but placed greater

weight on absolute inventory volumes held by importers, which remained roughly the same

from 2008 through interim 2010.  *Id.* (citing *Final Staff Report*, App. C at 6-7 (Table C-2)

(confidential version)).  The Commission specifically considered the impact of these high

inventory levels through the POI and found that "the record did not establish that these relative

inventory increases were a factor having a significant injurious impact on the domestic industry

during the POI, including in interim 2010."  *Id.*  The Commission concluded that "[a]bsent any

significant changes in market conditions that would suggest otherwise, we do not see any basis to

conclude that continued high ratios of subject inventories relative to apparent consumption

would be an indication that subject imports would likely have a significant adverse impact on the

domestic industry in the imminent future."  *Id.*

The court rejects the argument defendant-intervenors base on the ratio of importers'

inventories to apparent domestic consumption.  The ITC cannot be faulted for considering the

data on importers' inventories in light of other data of record that detracted from an affirmative

threat finding, such as data on market conditions.  The standard of review does not permit the

court to reweigh the evidence so as to reach a conclusion different from the Commission's on the

record data considered as a whole.

In a related argument, defendant-intervenors contend that the ITC erroneously discounted

the "the significance of the buildup in foreign producers' and importers' inventories over the

POI," having failed to recognize that that "inventory levels are leading indicators of sales, not

concurrent indicators (which is why the statute directs that they be considered as a threat

factor)."  Def.-intervenors' Comments 17-18.  But their characterization of a "buildup" in

importers' inventories "over the POI" is not a fair characterization of the record data, which

showed that combined importers' inventories of finished drill pipe and drill collars increased

from 2007 to 2008 but remained approximately level thereafter.  *See Final Staff Report* at VII-15

(Tables VII-4b, 4d) (confidential version).

Regarding the defendant-intervenors' reference to "foreign producer" inventories, the

ITC stated in the Remand Redetermination that "we do not find that any increases in the ratios of

Chinese producers' inventories of subject merchandise relative to Chinese subject producers'

total shipments and apparent U.S. consumption would be likely to have a significant adverse

impact on the domestic industry in the imminent future, especially given that they had also not

led to injury during the POI."  *Remand Redetermination* 8 n.25.  Defendant-intervenors dispute

the ITC's reasoning by contending that the patterns of the inventories observed during the POI,

including inventories held by producers in China, portend future injury.  Def.-intervenors'

Comments 18.  On this record, the ITC was not required to conclude or infer that the inventory

held abroad by Chinese producers required an affirmative threat determination, and it was

reasonable for the ITC to ground its decision in part on data pertaining to circumstances existing

during the POI.  Moreover, the Commission reasonably could consider inventory held by

Chinese producers, which is not necessarily destined for the United States, to be inherently less

probative of future injury than is inventory located in the United States.

Defendant-intervenors also raise an argument they ground in the significance of changes

in inventories of subject merchandise held by purchasers.  Def.-intervenors' Comments 14

(citing 19 U.S.C. § 1677(7)(F)(i)(V)).  Defendant-intervenors submit that "purchasers' total

inventories of finished drill pipe and drill collars increased steadily over the POI in absolute

terms to a peak at the end of the first half of 2010, so they increased tremendously compared to

consumption, given the sharp fall in demand in that time."  *Id.* at 15 (footnote omitted).

Defendant-intervenors add that "the one type of purchaser inventory that was declining was

Chinese-made merchandise," which, according to defendant-intervenors, "indicated that

purchasers were using their Chinese drill pipe preferentially[] and were consuming it faster than

they could buy."  *Id.* at 15-16.  Referring to these U.S. purchasers, defendant-intervenors add that

"[t]heir low levels of this product portended stepped-up purchases in the future" and that

"[i]ndeed, the record showed that U.S. purchasers were stepping up their purchases of

Chinese-made merchandise toward the end of the POI."  *Id.* at 16 (footnote omitted).  The court

does not find merit in these arguments.

The record data showed that purchasers' inventory of subject merchandise declined

generally over the POI.  *See Final Staff Report* at II-18 (Table II-4) (confidential version).  The

ITC analyzed these data, together with the data on importers' inventories of subject merchandise,

to determine whether inventory "overhang" existed that would cause it to alter its conclusion that

a substantial increase in imports of subject merchandise was unlikely.  *ITC Publ'n*, Original

Dissenting Views 45.  From the record evidence, the ITC found that "in this market there is no

overhang of inventories from subject sources waiting to be sold into the U.S. market in the

imminent future." *Id.* The Commission did not draw from the record evidence the speculative

inference defendant-intervenors would draw, i.e., that the draw-down of subject merchandise

from purchasers' inventories relative to the draw-down of domestic merchandise signaled an

imminent increase in the volume of subject imports. Although the statute required the ITC to

consider inventories of the subject merchandise, 19 U.S.C. § 1677(7)(F)(i)(V), nothing in the

statute required the ITC to draw the inference defendant-intervenors advocate. Moreover,

defendant-intervenors fail to identify record evidence that would make such an inference

inescapable, and the court is aware of no such evidence.

   4. The Court Sustains the Commission's Finding that Importers Did Not Use Underselling to
                Increase the Volume of Sales of Subject Merchandise

        The statute directs the Commission to consider "whether imports of the subject

merchandise are entering at prices that are likely to have a significant depressing or suppressing

effect on domestic prices, and are likely to increase demand for further imports." 19 U.S.C.

§ 1677(7)(F)(i)(IV). In support of their argument that the Commission erred in finding that

Chinese excess capacity would not lead imminently to increased imports of subject merchandise,

defendant-intervenors challenge a statement contained within a footnote in the Original

Dissenting Views: "As explained below, we find no evidence that importers used underselling to

increase the volume of sales in the U.S. market, a fact that further supports our finding as to

likely volume." *ITC Publ'n*, Original Dissenting Views 44 n.20. Defendant-intervenors point

out that the Commission itself acknowledged the fact that "subject imports undersold domestic

like product in most comparisons in 2010," arguing that "[t]hus, there was evidence of

significant underselling during the most recent part of the POI." Def.-intervenors' Comments 20

(citation omitted). Raising various objections to the Commission's findings and logic, they

argue that "[s]ince Chinese producers have made little progress in eliminating excess capacity

and only partial progress in reducing inventories, subject merchandise from China would be

likely to continue to undersell U.S. domestic like product in the imminent future as it had begun

to do in the first half of 2010, rather than returning to its pre-2009 pattern." *Id.* at 23-24

(footnote omitted).

The arguments put forth by defendant-intervenors are unpersuasive because substantial

record evidence supported the Commission's conclusion as to underselling.  The ITC observed

that the subject merchandise oversold the domestic merchandise in a majority of price

comparisons during the POI but undersold the domestic merchandise in six of eight comparisons

in interim 2010.  *ITC Publ'n*, Original Dissenting Views 53.  The Commission added that "the

subject merchandise undersold the domestic product in four of four price comparisons in the first

quarter of 2010, but in only two of four price comparisons in the second quarter of 2010." *Id.*

at 53-54 (footnote omitted).  The ITC further noted, and the data confirmed, that the margins of

underselling in the two instances in the second quarter of 2010 were much smaller than the

margins of underselling in the first quarter.  *Id.* at 54.  The Commission stated that "[w]e do not

consider the underselling observed during the most recent six month period to constitute

evidence that significant underselling is likely in the imminent future." *Id.* at 53.

The record evidence that underselling occurred more frequently in interim 2010 than in

the prior three years of the POI, viewed in isolation, might have been seen to contribute to an

affirmative threat determination.  But on this record the ITC did not err in finding that importers

of subject merchandise did not use underselling to increase the volume of sales of subject

merchandise in the United States, as there was substantial evidence to support this finding.  The

decreasing incidence, and in particular the steeply decreasing magnitude, of the underselling

during the first six months of 2010 supported a conclusion that significant underselling was

unlikely to cause an increase in subject import volumes in the imminent future, as did the fact

that incidences of underselling by the subject merchandise did not predominate when compared

to incidences of overselling during the POI in general.  *See Final Staff Report* at V-10 to V-15

(Tables V-2 to V-7) (confidential version).

Defendant-intervenors also contend that the ITC's analysis "rested on a clear error of

fact."  Def.-intervenors' Comments 20.  They point to a statement by the Commission that

"'[b]ecause subject imports mostly oversold the domestic product when demand was increasing

during the 2007 to 2008 time frame, we expect overselling to predominate in the imminent

future, consistent with the pattern observed during the period examined.'"  *Id.* (quoting *ITC*

*Publ'n*, Original Dissenting Views 53).  Directing the court's attention to data on total

consumption of finished drill pipe and drill collars, defendant-intervenors assert that "[t]he

record shows that demand peaked in 2007," *id.* (citing *Final Staff Report* at C-6, C-7 (Table C-2)

(confidential version)) and that "it was decreasing, and it decreased more in 2009," *id.*  They

submit that the ITC "was thus wrong to conclude that overselling was associated with increasing

demand," *id.* at 20-21, and that "[d]emand finally began to increase from the second half of 2009

to the first half of 2010, when underselling increased, so if anything, increasing demand is

associated with large and increasing levels of underselling," *id.* at 21.

Defendant-intervenors are correct that the record data on U.S. consumption of the

finished goods show that consumption was higher in 2007 than in 2008.  But these data do not

demonstrate an error of fact undermining the Commission's analysis.  Consumption may be a

reliable indicator of demand when supply and demand are in balance, but as discussed

previously, the ITC identified a special circumstance that affected U.S. market conditions: an

overheated demand environment was found by the ITC to have existed in the 2007 to 2008

timeframe, characterized by "reported supply tightness in the U.S market," *ITC Publ'n*, Original

Dissenting Views 42, and also characterized by extended lead times of U.S. producers in 2008

compared to imports of the subject products, *id.* Original Dissenting Views 42 n.8.[7]  The ITC

also found that Chinese imports did not compete meaningfully in the premium segment of the

drill pipe market.  *Id.*, Original Dissenting Views 60.  On these findings and the record facts, it

was reasonable for the Commission to conclude that there was some constraint in the supply of

the domestic products relative to demand in 2008.  In this regard, the record showed that subject

imports peaked in 2008—just as the supply of the domestic products would appear to have been

constrained, as shown by the extended lead times—and then declined precipitously in 2009.

Moreover, the consumption data on which defendant-intervenors rely for their "clear error of

fact" argument, when considered in the context of other record data, do not show enough of a

decline in consumption to compel a finding that demand actually fell between 2007 and 2008.

These data show that consumption of finished goods declined only somewhat from 2007 to 2008,

remained relatively high compared to the remainder of the POI, and declined drastically

from 2008 to 2009.  *Final Staff Report.* at C-6 (Table C-2) (confidential version).  The

Commission's analysis that demand, when evaluated according to factors that include not only

data on consumption but other record data, was increasing in the 2007 to 2008 timeframe is

substantiated by the record evidence considered as a whole.

---

[7] The record contained evidence of supply tightness in the U.S. market that was related to the extended lead times of domestic suppliers.  *See Drill Pipe & Drill Collars from China: Staff Report to the Comm'n on Investigation Nos. 701-TA-474 and 731-TA-1176* (Final) at II-13, II-14 (Jan. 26, 2011) (Conf. Admin.R.Doc. No. 523).

5.  The Commission Provided an Adequate Explanation for its Conclusion on Product-Shifting

The Tariff Act requires the ITC to consider, when assessing the threat of material injury, "the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products." 19 U.S.C. § 1677(F)(i)(VI).  Recognizing in its threat analysis that unfinished drill pipe could be made on certain production lines in China that now make seamless oil country tubular casing and tubing ("oil country tubular goods," or "OCTG"), the ITC considered the extent to which such "product-shifting" was likely to occur in the imminent future.  *ITC Publ'n*, Original Dissenting Views 45.  The Commission concluded that the potential for product-shifting existed but was "somewhat limited."  *Id.*  Citing record data on imports of unfinished drill pipe and drill collars from China for the period corresponding to, and extending beyond, the effective dates of antidumping and countervailing duty orders on OCTG from China, the Commission concluded that the record "does not indicate any significant surge into the U.S. market of such products when the OCTG orders went into effect . . . ."[8]  *Id.* at 45 & n.26 (comparing record data on subject imports of unfinished products for interim 2010 with data for the first half of 2009 (citing *Final Staff Report.* at C-4, C-5 (Table C-1) (confidential version))).

Defendant-intervenors claim that the Commission's "product-shifting analysis was unexplained," objecting that the ITC "did not explain why they compared imports in the first half of 2009 to imports in the first half of 2010, rather than comparing imports in the period

---

[8] A countervailing duty order went into effect on January 20, 2010.  *Certain Oil Country Tubular Goods From the People's Republic of China: Am. Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3,203 (Int'l Trade Admin. Jan. 20, 2010).  An antidumping duty order followed on May 21, 2010.  *Certain Oil Country Tubular Goods From the People's Republic of China: Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28,551 (Int'l Trade Admin. May 21, 2010).

immediately before imposition of the order and immediately after."  Def.-intervenors'

Comments 24  "Had they compared imports of unfinished drill pipe in the second half of 2009 to

imports in the first half of 2010, they would have seen that they increased."  *Id.* (citing *Final*

*Staff Report* at C-4, C-5 (Table C-1) (confidential version)).  Defendant-intervenors, however, do

not show that the Commission erred in analyzing the subject data or in providing an explanation

for its conclusion.  Subject imports of unfinished drill pipe and drill collars increased from

second-half 2009 to first-half 2010, but from a very low level, having plummeted in

second-half 2009.  *See Final Staff Report* at C-4, C-5 (Table C-1) (confidential version).

Although imports of subject unfinished drill pipe recovered somewhat in first-half 2010, it was

only to a level far below what they had been in first-half 2009.  *Id.*  Subject imports of finished

drill pipe and drill collars followed the same pattern in 2009 and first-half 2010, but the ITC

concluded that significant additional finishing is required to produce finished drill pipe, making

product-shifting from OCTG to finished drill pipe less likely.  *ITC Publ'n*, Original Dissenting

Views 45.  The record data, considered on the whole, supported the Commission's conclusion

that no significant surge into the U.S. market of unfinished products occurred when the OCTG

orders went into effect.  The court, therefore, has no valid basis on which to conclude that the

ITC's product-shifting analysis was flawed and thereby merits a remand on the ground that the

product-shifting analysis was "unexplained."[9]

---

[9] To further their argument on the issue of product-shifting, defendant-intervenors characterize as irrelevant certain hearing testimony the ITC cited in support of the conclusion that "it is unlikely that production could be easily shifted from either" oil country tubular goods ("OCTG") or "seamless pipe to production of finished drill pipe."  Def.-intervenors' Comments 24-25 (citing *ITC Publ'n*, Original Dissenting Views 45 & n.27).  Read in context, the cited testimony is merely tangential to the point the Commission expressed in the sentence at issue—that "finishing processes for finished drill pipe are extensive, and thus it is unlikely that production could be easily shifted from either OCTG or seamless pipe to production of finished

(continued…)

6.  The Commission Did Not Reach a Finding as to Existing Unused Capacity that Lacked a "Rational Connection Between the Facts Found and the Choices Made"

Alluding to certain of their previous arguments (which the court rejected above), defendant-intervenors challenge the Commission's "conclusion that high levels of excess capacity besetting producers of subject merchandise at the end of the POI would not likely lead to significantly increased imports."[10]  Def.-intervenors' Comments 26.  Taking issue with what they consider to be certain of the reasons the ITC offered, defendant-intervenors submit that the conclusion "lacked a 'rational connection between the facts found and the choices made.'"  *Id.* at 26-27 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  The court disagrees.

Defendant-intervenors once again base an argument on the Commission's statement that "'we do not consider that the existing unused production capacity in China, or the export orientation of Chinese producers, indicates a likelihood of substantially increased imports of the subject merchandise into the United States, given the demonstrated ability of other export markets to absorb any additional exports from China.'"  *Id.* at 25-26 (quoting *ITC Publ'n*,

---

(continued…)

drill pipe."  *ITC Publ'n*, Original Dissenting Views 45 (footnote omitted).  Moreover, the testimony cited in the footnote addresses the general subject of product-shifting and therefore is not "irrelevant."  Finally, defendant-intervenors take issue with the Commission's conclusion in the next sentence that "'it is unlikely that producers of subject merchandise in China would shift to the production of subject merchandise given the lack of motivation to do so in the imminent future.'"  Def.-intervenors' Comments 25 (quoting *ITC Publ'n*, Original Dissenting Views 45-46).  They characterize this sentence as "opaque" and assert that "the relevant incentive to shift production from OCTG to drill pipe is the new order on OCTG."  *Id.*  The Commission, however, acknowledged that the potential for product-shifting as a result of the OCTG orders "exists currently."  *ITC Publ'n*, Original Dissenting Views 45.

[10] For example, defendant-intervenors repeat their argument that "[t]he new majority also asserted that a significant increase in subject imports could not occur absent 'the backdrop of an overheated demand environment' or 'extended lead times of U.S. producers, because only such an environment had led to increased import market share in 2008.'"  Def.-intervenors' Comments 26 (quoting *ITC Publ'n*, Original Dissenting Views 44).  As discussed previously in this Opinion, this argument mischaracterizes the finding the ITC actually made.

Original Dissenting Views 45).  Defendant-intervenors argue that "the evidence the new majority

cited—the reduction in the share of total Chinese exports going to the United States—was not

rationally connected to this finding, and the fact that Chinese producers had been unable to ship

enough to third country markets to avoid their excess capacity situation contradicted it."  *Id.*

at 26.  But the evidence showing that an increasing share of total Chinese export production of

drill pipe and drill collars went to third country markets during the POI had at least some

relevance to that finding.  The implication of defendant-intervenors' argument is that a finding

that excess capacity was likely to lead to an increase in subject imports was unavoidable due to

the lack of evidence that third country export markets could absorb sufficient Chinese exports to

allow the Chinese producers to achieve full capacity utilization in the future without expanding

their exports to the United States.  As is apparent from the court's previous discussion, the ITC

did not base the finding of which defendant-intervenors complain on a prediction that third

country markets necessarily would absorb all additional Chinese exports even at full capacity

utilization.  Moreover, the ITC based its finding on a range of factors in addition to the record

evidence that third country markets had absorbed a generally increasing share of total Chinese

exports of drill pipe and drill collars during the POI.  This included record data that imports of

subject finished merchandise had increased only moderately between 2007 and 2008 before

declining precipitously in 2009, that the U.S. market share of Chinese finished products had

declined over the POI, and that imports of subject unfinished products did not surge between

2007 and 2009.  *See ITC Publ'n*, Original Dissenting Views 44 & n.19 (citing *Final Staff Report*

at C-4, C-5 (Table C-1) (confidential version)).

        In making their argument, defendant-intervenors also misinterpret the issue that the

Commission was discussing.  As the Commission itself stated, "the issue before us . . . is not

simply the amount of excess capacity that currently exists in China but rather whether, given the

conditions of competition in the U.S. market, the Chinese industry is likely to use that excess

capacity to substantially increase shipments to the U.S. market." *Id.* at 44.  As the ITC

acknowledged, the record contained evidence related to existing unused production capacity that

could serve as support for an affirmative threat finding.  For example, the Commission

recognized that reported Chinese excess capacity was extensive, that it increased overall during

the POI, and that for finished products this capacity exceeded apparent U.S. consumption in

2009.  *Id.* at 43-44.  The Commission further stated that "[o]n balance, however, we find that

Chinese drill pipe and drill collar producers have the ability to increase shipments to the United

States" and that the Chinese drill pipe and drill collar industry is "export-oriented."  *Id.* at 44.  As

defendant-intervenors point out, there also was record evidence that the Chinese industry

exported a large share of its output, a share that had mainly increased during the POI,

Def.-intervenors' Comments 6, and that unused capacity far exceeded total exports by the end of

the POI, *id.* at 7.  Defendant-intervenors would surmise that "[t]he undisputed fact that Chinese

producers' unused capacity was so 'extensive' by the end of the POI . . . showed that their export

markets were inadequate to absorb their surplus."  *Id.* at 6 (citation omitted).  According to

defendant-intervenors, "[t]hese findings indicated that Chinese drill pipe producers had a

powerful motivation to significantly increase their exports to the United States: to reduce their

excess capacity" and that the unused capacity, "combined with Chinese producers' proven ability

to export far larger quantities than they were at the end of the period of investigation ('POI'),

gave them the means to achieve this end."  *Id.* at 2.

　　　　When viewed in the context of the relevant statutory language, the general argument

defendant-intervenors seem to make concerning the existing unused capacity essentially is that

the Commission erred in *not* reaching a comprehensive finding that an increase in the capacity

utilization of the Chinese producers was likely to occur, that such an increase indicated "the

likelihood of substantially increased imports into the United States," 19 U.S.C.

§ 1677(7)(F)(i)(II), and that the likely increase in subject imports was "imminent" within the

meaning of 19 U.S.C. § 1677(7)(F)(ii).  The evidence that unused capacity was extensive and

had increased over the POI, even when coupled with evidence that the export-oriented Chinese

industry had exported a large share of its output, and even when considered with the other

evidence that defendant-intervenors cite, did not suffice to compel the ITC to find that the

existing unused capacity likely would lead to substantially increased exports of the subject

merchandise to the United States.  As the court has discussed, the record contained considerable

evidence that detracted from such a finding.  The ITC complied with the statute by considering

each of the relevant factors required by 19 U.S.C. § 1677(7)(F)(i) and basing findings thereunder

on the record evidence considered as a whole.

  B.  The Court Rejects Defendant-intervenors' Argument that the ITC's Analysis of the Financial
Performance of the U.S. Industry Was "Fundamentally Flawed"

     Defendant-intervenors' final argument is grounded in certain data on the financial

performance of NOV Grant Prideco, which the ITC identified as "the leading U.S. producer of

finished drill pipe and the second largest U.S. producer of finished drill collars."  *ITC Publ'n*,

Original Dissenting Views 56 n.97.  Defendant-intervenors direct the court's attention to the

Commission's statement that "'because of its dominant size, NOV Grant Prideco's financial

results have a large impact on the combined financial results of the domestic industry.'"  Def.-

intervenors' Comments 27 (quoting *ITC Publ'n*, Original Dissenting Views 56 & n.97).

     At oral argument on the Remand Redetermination, defendant-intervenors expressly

waived their argument pertaining to NOV Grant Prideco to the extent this argument is framed as

a challenge to the ITC's negative injury determination.  Oral Tr. 10.  Clarifying that they are not

challenging the Commission's negative injury determination, they expressed an intention to

maintain their argument to the extent relevant to challenging the ITC's negative threat

determination.  *Id.*  The court, therefore, considers their argument only in this context.  As

discussed below, what little is left of that argument lacks merit.

     The Commission's discussion of NOV Grant Prideco's financial performance occurred in

the midst of an analysis of present injury, not threat.  *See ITC Publ'n*, Original Dissenting

Views 56-57.  Considered as it applies to the negative threat determination, defendant-

intervenors' argument can pertain only to the Commission's finding as to the current

vulnerability of the domestic industry.  On that subject, the Commission stated that "[a]s an

initial matter, we do not find that the domestic industry producing drill pipe and drill collars is

currently vulnerable."  *Id.* at 59.  According to defendant-intervenors, the ITC should have

viewed the reduction in profitability of the domestic industry reflected in the reported financial

information of NOV Grant Prideco as related to subject imports.  Def.-intervenors'

Comments 28 ("The new majority . . . has no basis for assuming that this substantial reduction in

industry profitability was 'unrelated to subject imports.'" (quoting *ITC Publ'n*, Original

Dissenting Views 57)).  Defendant-intervenors submit that correction of this error would require

the ITC to "revise its analysis of vulnerability, which rested in part on its conclusion that

'throughout the period examined, U.S. producers . . . experienced high levels of profitability.'"

*Id.* at 29 (quoting *ITC Publ'n*, Original Dissenting Views 59).

     The court disagrees that the Commission erred in reaching a conclusion that the domestic

industry was not currently vulnerable.  In support of that conclusion, the ITC found that

"throughout the period examined, U.S. producers invested in greater production capacity,

experienced high levels of profitability, and currently remain in a strong position

notwithstanding the gradual economic recovery." *ITC Publ'n*, Original Dissenting Views 59

(footnotes omitted).  The ITC proceeded to summarize the various data on the record related to

the vulnerability issue, from which it concluded that "most trends point to a healthy industry that

is weathering its normal business cycle, albeit one that has been exacerbated by the general

economic recession." *Id.* at 59-62.  Among the trends cited were improving demand for drill

pipe and drill collars, the dominance of domestic producers in the important, growing, and

high-priced premium sector of the market, and the general competitiveness of U.S. producers in

growing export markets.  *Id.* at 60.

When making the statement that U.S. producers experienced high levels of profitability

throughout the POI, the Commission already had acknowledged, in its previous discussion

directed to the question of present injury, the information on the reported financial performance

of NOV Grant Prideco to which defendant-intervenors direct their argument.  The ITC

considered the information to result "primarily from a one-time adjustment" that was "unrelated

to subject imports." *Id.* at 57.  Significantly, the Commission, following that discussion, stated a

finding that "[i]n any event, the finished drill pipe and drill collar industry returned to

profitability in interim 2010 . . . ." *Confidential Excerpts from ITC Publ'n*, Original Dissenting

Views 28, (Feb. 2011) (Conf. Admin.R.Doc. No. 358) (showing statement redacted from public

version (*cf. ITC Publ'n,* Original Dissenting Views 57)).  In support of that finding, the

Commission cited industry-wide data on operating income and the ratio of operating income to

total net sales. *ITC Publ'n*, Original Dissenting Views 57-59.  As it applies to the threat

determination, defendant-intervenors' argument fails because it does not challenge that finding.

The argument defendant-intervenors direct against the ITC's negative vulnerability finding is undermined by the Commission's having analyzed the overall profitability of the domestic industry during the POI in two ways, one of which considered the effect of the NOV Grant Prideco adjustment and one of which did not.  The former led to the Commission's overriding conclusion that even if there had been an interruption in the overall profitability of the domestic industry that was represented by the one-time adjustment, that interruption was followed "in any event" by a return to profitability of the industry as a whole.  Even were the court to assume, *arguendo*, that defendant-intervenors are correct in their assertion that the adjustment pertaining to NOV Grant Prideco was related to subject imports (an assertion that defendant-intervenors fail to demonstrate is correct), the court still would be forced to reject defendant-intervenors' challenge to the negative vulnerability finding.  Absent a challenge to the finding that the domestic industry, in any event, returned to profitability by the end of the POI, defendant-intervenors' argument that the ITC erred in concluding that the industry is not currently vulnerable is not a plausible one.  That conclusion was based not only on profitability data for the domestic industry at large, including NOV Grant Prideco, but also on various other indications of the industry's strength.

### III. CONCLUSION

For the aforementioned reasons, the court rejects the various arguments defendant-intervenors raise in their challenge to the Remand Redetermination.  The ITC complied with the order issued in *Downhole Pipe I* by reconsidering its previous affirmative threat determination in the absence of the erroneous findings and unwarranted conclusions the court previously disallowed.  As the court stated in *Downhole Pipe I*, nothing in that order precluded the ITC, on remand, from reconsidering those or any other findings.  *Downhole Pipe I*,

37 CIT at __, 963 F. Supp. 2d at 1347-48.  The court concludes that the Remand

Redetermination must be affirmed and will enter judgment accordingly.


<u>/s/Timothy C. Stanceu</u>
Timothy C. Stanceu
Chief Judge

Dated: November 10, 2014
New York, New York